PRODUCE TRADING COMPANY v. NORFOLK SOUTHERN RAILROAD
COMPANY.

(Filed 1 October, 1919.)

1. **Carriers of Goods—Negligence—Connecting Lines—Initial Carriers—Evidence—Questions for Jury.**

There was evidence that an interstate carrier by water transported
several carload shipments of potatoes to a point within the State, where
the shipper had them assorted and then they were taken in several carload
lots to a point in another State, and thence, upon telegraphed instructions, one of them was reconsigned to a still further point, the transportation by rail being over connecting carriers.  On one of these shipments
originating by boat, which went to a place in this State and was reshipped
from there under a new bill of lading by defendant, the destination was
left blank in the bill of lading issued by the carrier by water: *Held*, the
steamboat company cannot be held as the initial carrier, as a matter of
law, and it was properly left to the jury, under the conflicting evidence,
to determine whether it or the first carrier by rail was the initial one,
and therein the bills of lading were competent evidence of the intent of
the contracting parties and of the true contract of shipment.

2. **Carriers of Goods—Interstate—Initial Carriers—Negligence—Damages—Federal Statutes.**

Under the Carmack amendment to the federal statute the initial carrier
of interstate freight is liable to the party aggrieved or suffering loss by
reason of the carrier's negligence in transporting the shipment, on whichever of the connecting carriers such loss may have occurred.

3. **Carriers of Goods—Intermediate Carrier—Negligence—Burden of Proof—Damages.**

An intermediate carrier in the line of connecting carriers of interstate
freight is responsible for loss or damage arising to the shipment through
its own negligence, with the burden of proof on it, when sued for damage to the goods, to show that the negligence had not occurred on its
own line.

4. **Carriers of Goods—Negligence—Damages—Equitable Assignment—Party Aggrieved.**

The rule that where a shipment of goods is delivered to the carrier
addressed to the consignee, the latter is the party aggrieved and the only
one entitled to maintain his action against the carrier for loss or damage
resulting to the shipment through the carrier's negligence, does not apply
when it appears that the consignor and consignee have by their agreement or contract changed this ordinary rule, as where the consignee, with
the consent of the consignor, has deducted the amount of such damage
from the purchase price and the consignor had accordingly accepted the
settlement, for such is, in effect, equitable assignment by the consignor of
his right to recover of the carrier, and the consignor may maintain his
action therefor.

5. **Carriers of Goods — Consignee — Inspection — Damages—Refusal—Consignor—Party Aggrieved.**

A consignee of goods shipped to him has a reasonable right of inspection before accepting them from the carrier, and to reject them if dam-

aged by the carrier's negligence; and where the consignee has accepted such damaged shipment under an agreement with the consignor that such damages be deducted from the purchase price, the consignor may recover them from the carrier, as the party aggrieved.

**6. Carriers of Goods—Exchange Bills of Lading—Reconsignment—Same Shipment.**

> The exercise by the consignor of his right to have a shipment of goods reconsigned *in transitu* at an intermediate point, under an exchange bill of lading, does not constitute, in law, two separate and distinct shipments.

ACTION tried before *Devin, J.,* and a jury, at February Term, 1919, of PASQUOTANK.

### FIRST SHIPMENT—SECOND ISSUE.

Plaintiff sued for damages sustained in the shipment of potatoes, and he especially relied on negligence in the transportation of four lots, some of which were either injured or lost. The inquiry in regard to those damages is covered by the second, fifth, sixth and tenth issues. The first shipment of 200 barrels was to Elizabeth City, N. C., at which place, on the wharf of defendant, the potatoes were deposited by the North River Steamboat Company, it having been brought by that line from one of its landings on the river at Jarvisburg, N. C., 14 June, 1917, under a bill of lading, in which they were consigned by the plaintiff to itself—destination not mentioned but left blank. These potatoes were loaded in defendant's cars, and they were carried to Berkley, Va., and by telegraph ordered to be reconsigned there to John A. Eck, at Chicago, Ill. When they were loaded in cars at Elizabeth City, N. C., a through way-bill, or shipping instructions, reading from Jarvisburg, N. C., to Berkley, Va., was handed by the agent of the steamboat line to the agent of defendant at Elizabeth City. Ten barrels of these potatoes were lost in transit, and the market price of the others had fallen fifty cents per barrel by reason of the delay in shipment, causing the consignor to lose that much from the contract price, as the consignee exacted that much in reduction of the amount due by them.

### SECOND SHIPMENT—FIFTH ISSUE.

This shipment contained 200 barrels of potatoes, consigned by plaintiff to Lally Brothers, at Chicago, Ill. Four barrels were lost in transit, and the rest were delayed in shipment and damaged by delay. The car was in bad condition, and was marked "Car in bad order, shop when empty." These potatoes were brought by the North River Line to Elizabeth City, N. C., from Morris' Wharf, N. C., a landing on the river, on 18 June, 1917. The goods moved from Elizabeth City by defendant's line and connecting carriers to Chicago, Ill. Plaintiff claims as damages $330.

### THIRD SHIPMENT—SIXTH ISSUE

The bill of lading, in this case, was issued by the defendant at Pasquotank, N. C., on 19 June, 1917, in the name of the Produce Trading Company, as consignor and consignee, destination Berkley, Va., for 175 barrels of potatoes, and the bill was endorsed "S. L. & C.," meaning "shippers load and count." The car left Pasquotank on 19 June, arrived at Berkley, Va., at 4:10 p. m. the same day, and the next day, 20 June, 1917, plaintiff, by telegraph, reconsigned it at that place to Zivi & Co., Chicago, Ill., route Star Union. Plaintiff alleged damage to seven barrels of the potatoes and delay in transporting the remainder of them, whereby, as to the latter part of the shipment, plaintiff lost one dollar and 50-100 per barrel by the decline in the price. The claim is for $28 on account of the lost barrels of potatoes and $256.50 for the loss in price of the others.

### FOURTH SHIPMENT—SIXTH ISSUE.

This was 207 barrels of potatoes received by defendant at Bishop's Cross and consigned to Watson & Sons, Chicago, Ill., on 17 June, 1917. When the car of potatoes arrived at its destination it was found to be short nine barrels, for which plaintiff claimed damages in the sum of $90.

Upon the verdict, the court gave judgment for the total amounts assessed by the jury under the foregoing issues, and defendant appealed.

*Aydlett, Simpson & Sawyer for plaintiff.*
*Thompson & Wilson and W. B. Rodman for defendant.*

WALKER, J., after stating the case: We have only given an outline of the several causes of action upon which the four sets of issues above set out were framed, preferring to mention the other pertinent facts in this opinion when dealing with each shipment separately.

The first set of issues related to the shipment of potatoes by the plaintiff via the North River Line to Elizabeth City, N. C., from a landing on the river. The evidence tends to show that various shipments were made to that place and there assembled for transportation, after being assorted, to distant points in other States. It did not appear clearly at the trial whether the defendant, or the North River Line, was the first carrier in the line of continuous transportation to the final destination, and the court, therefore, very properly submitted the question to the jury to say how this was. There was testimony which would authorize a decision either way, and the evidence was not conclusive of the question for either side. The proper course was therefore taken, for the decision of the question depended upon how the jury should find the

12—178

facts to be. There was no destination stated 'in the original bill of lading, and defendant contends that the shipment was intended for Berkley, Va., from which place it was reconsigned to John A. Eck Company at Chicago, Ill. It would be impossible to hold, as a matter of law, that defendant was not the first carrier, as to do so we would have to ignore all the evidence as to the position held by the North River Line. In the first place, it was for the jury to say whether Berkley was originally intended as the destination when its designation was left blank in the bill of lading. We cannot assume in law that it was so intended to be. The jury had the right to consider the bills of lading in connection with the other relevant testimony, and they would have to do so, in order to give the true effect to the transaction. Having decided that defendant was the initial carrier, it made no difference under the Carmack amendment to the Interstate Commerce Act, as to this shipment, whether defendant was chargeable with negligence, either in respect to the loss of the potatoes or any part thereof or of the damage to them. This, we take it, is conceded by the defendant, but if not, it is correct as a principle of the law applicable to this case. But the defendant argues that the steamboat company was engaged in interstate commerce, and therefore it must have been the first carrier, and not the defendant. But the conclusion does not follow from the premise. Counsel rely on the following authorities to sustain their position: *Texas, etc., R. R. Co. v. Sabine Tram Co.,* 227 U. S., 111 (57 Law Ed., 442); *S. P. Terminal Co. v. Interstate Commerce Commission,* 219 U. S., 498 (55 L. Ed., 310); *Railroad Commission v. Washington,* 225 U. S., 101 (56 L. Ed., 1004). But the question there was not as to who was the initial carrier within the meaning of the Carmack amendment, but whether the defendant carriers were engaged in interstate commerce, and therefore subject to the rates prescribed by the Interstate Commerce Commission, and not to those of the State Railroad Commission. We will refer further to only one of those cases, which is typical of all of them, the others being practically like it. In *Railroad Co. v. Sabine Tram Co., supra,* we understand the case and decision to be this: A shipment of lumber, destined by the purchaser for export, was made by the seller under a local bill of lading from an interior point in Texas to a Texas Gulf port, at which the lumber was unloaded without delay by the purchaser's order into slips or docks, in reach of ship's tackle, and was then loaded into chartered ships, by which it was carried to foreign ports—such shipment not being an isolated one, but typical of many others—constitutes foreign commerce, as the court held, and as such is governed by the tariffs on file with the Interstate Commerce Commission to the exclusion of the rates established by the State Railroad Commission, although the seller had no connection with the lumber after it reached

the railway terminus, and had no concern with its destination after it came into the hands of the purchaser, and no knowledge thereof, and although the lumber had no definite foreign destination at the time of the initial shipment. But this, according to our conception, is far from holding that the first railroad which handled the lumber at Rutliff, in Texas, and destined for Sabine, was an "initial carrier." The Court held that the connecting carriers, all in Texas, from the first to the last, were subject to the federal tariffs as to switching charges, as they were engaged in interstate commerce.

The second shipment was from plaintiff, at Morris' Wharf, N. C., on the North River Line, to Lally Brothers, Chicago, Ill., and the Court held that the steamboat company was the initial carrier, and called upon the jury to inquire and find whether the defendant, who was an intermediate carrier, was actually negligent in respect to the loss of four barrels of potatoes and damage to the others, and liable therefore as a question of fact. We do not see why the case is not fully covered by *Meredith v. R. R.,* 137 N. C., 478, assuming the contract of carriage to have been that defendant, as an intermediate carrier, agreed to transport the goods over his own line and to deliver them to the next carrier on the route in the same condition that he received them. The consignor or consignee does not know the facts and it must be difficult, if not impossible, to prove them. The carriers do know them, or should know them. It is easy for any of the carriers to prove that he delivered them in good order to the next carrier, but not so for the consignor or consignee. In such a case, *Justice Connor* says, citing 3 Wood on Railroads, 1926; *Railroad Co. v. Tupelo Co.,* 67 Miss., 35; *Railroad Co. v. Emrich,* 24 Ill. App., 249, that "on proof that any carrier on the route received the goods in good condition, the burden of proof rests upon such carrier to show delivery in the same condition to the next carrier or to the consignee, it being peculiarly and almost solely within its power to make such proof." He supports the proposition by many authorities, and among them 1 Elliott on Ev., 141; *U. S. v. R. R.,* 191 U. S., 84; *Brintnall v. R. R.,* 32 Vt. (op. by *Poland, J.*); *Ellis v. R. R.,* 24 N. C., 138; *Aycock v. R. R.,* 89 N. C., 321; *Lindley v. R. R.,* 88 N. C., 547; *Phillips v. R. R.,* 78 N. C., 294. In the *Meredith case, supra,* reference is made to *Mitchell v. R. R.,* 124 N. C., 236, as follows: "The principle is applied in an able and exhaustive opinion by *Mr. Justice Douglas.* It is true that he was discussing the question in respect to the burden of proof as applied to the last carrier, but we can see no reason why the same rule does not apply when the first or contracting carrier is sued. In both cases the plaintiff's cause of action is based upon the assumption of a duty and the breach thereof. The same reason which requires the last carrier to show performance of the duty

applies with equal force to the first—that the sources or means of proving the exculpating facts are peculiarly within its knowledge and not otherwise open to the plaintiff. It would be a difficult if not a vain undertaking on the part of the plaintiff to locate the time and place at which his goods were injured or their delay of fourteen days occurred. Every reason which justifies the rule as to the first carrier applies with equal force to the other. It assumed the duty of safety, and within a reasonable time conveying the goods to Wilmington and delivering them to the Coast Line," that railroad company, the Coast Line, being the next carrier and also the last one in the route. *Chief Justice Smith* said, in the *Lindley case, supra:* "The obligation resting on each attaches as the goods pass into its custody, and ceases only when safely carried and delivered to its successor." The Court also says in the *Meredith case* that the license cases (*S. v. Morrison,* 14 N. C., 299; *S. v. Emery,* 98 N. C., 668; *S. v. Glenn,* 118 N. C., 1194) also support the doctrine as to the *prima facie* case and the burden resting upon the carrier of going forward with its proof of facts peculiarly within its knowledge or of taking the risk of defeat, as the *prima facie* case carries the case to the jury, the principle of all such decisions being really the same. 1 Elliott on Ev., 141, says: "The fact that the party having peculiar knowledge of the matter fails to bring it forward, may raise a presumption or justify an inference in favor of his adversary's claim, and thus shift the burden of proceeding in order to win, but the burden of establishing the issue is not shifted, nor is it ordinarily determined in the first instance by the mere fact that a negative is involved or that some fact is peculiarly within the knowledge of the adverse party." We cannot see why, under this reasonable and firmly established principle, there is not enough shown in this case to bring it within the operation of the same. There was sufficient evidence of the good condition of the potatoes when loaded on the defendant's car, and when they reached their destination the car was in a bad plight. The defendant should have offered evidence that it continued in the same condition it was when started by it on its journey until it had been delivered to the next carrier in the line of transportation, the *prima facie* case being enough to carry the case to the jury. We, therefore, hold that the charge with reference to this shipment was correct.

The third shipment, containing 175 barrels of potatoes, originated at Pasquotank or Elizabeth City, N. C., and was consigned by plaintiff to itself at Berkley, Va., and by its direction reconsigned, at that station, to Zivi & Co., Chicago, Ill. The defendant was the initial carrier and consequently was liable, under the Carmack amendment, for any loss or damage occurring during the carriage, whether caused by its negligence or not. Its remedy is one against the defaulting carrier, if it was not

itself negligent.   This shipment is governed by the principle already discussed.

The fourth shipment contained 207 barrels of potatoes, consigned by plaintiff at Bishop's Cross, N. C., to C. A. Watson & Sons at Chicago, Ill.  This consignment is governed by the same rules heretofore discussed and applied, where defendant was the first carrier, and no further comment is necessary.

We will now consider some general questions raised by the defendant, together with the assessment of damages on each of the shipments.

It is urged that the bills of lading were open, which means that the consignor neither retained the title or any interest in the goods, and the defendant insists that, this being so, the property in the goods passed from consignor to consignee at the time of delivery to the carrier, and the plaintiff, therefore, not being injured by any loss or damage sustained, is not the proper party to sue for the same.   But while that is perhaps true, nothing else appearing but the straight consignment and delivery to the carrier, there may be such an arrangement between the two parties, consignor and consignee, as to change the ordinary rule arising out of that simple relation and to entitle the consignor to sue for the loss or damage.   Has such a change been wrought in this case? We are of the opinion that there has been.   If the goods were either lost or damaged by the wrong or negligence of the carrier, and on demand of the consignee, and afterwards by mutual consent of the parties, the price of the goods was docked by as much as the loss or damage, and the settlement made on that basis, we cannot see why this does not amount to an equitable assignment to the consignor of the consignee's right to recover of the carrier, and to the extent that the consignor has been required to reduce the price he has suffered a loss by the negligence of the carrier.   Whether you consider it as an assignment to the consignor of the consignee's right to so much against the carrier, or as a loss of so much indirectly to the consignor by the negligence, or as ultimately a sale on the account of the consignor, it seems to us that the latter should have the right to sue.   We have said that, by the consignment under such a bill of lading the title *prima facie* passes to the consignee, which does not, however, exclude the idea that the consignor has not lost all and every right in the shipment.   The consignee gets the title, so that he may sue for the specific recovery of the goods, and damages for any loss or injury to them by the carrier, if he elects so to do, but he may settle with the consignor, or so agree with him, that the latter may acquire the right to recover for any loss or damage he may have suffered.   The case falls within the principle of *Aydlett v. R. R.,* 172 N. C., 47; *Buggy Co. v. R. R.,* 152 N. C., 122; *Summers v. R. R.,* 138 N. C., 295; *R. R. v. Guano Co.,* 103 Ga., 590; *Cardwell v. R. R.,*

146 N. C., 218. But if this is not so, the consignee would not have received the goods but for this arrangement, and he had the right of reasonable inspection for the purpose of ascertaining their condition and rejecting them if damaged. 6 Cyc., 465. If the consignee could refuse to receive the goods, on account of injury to them caused by the negligence of the carrier, a reduction in price allowed to induce a receipt of them would be the loss of the consignor for which he should recover of the carrier, as he is the party aggrieved, and to the extent of this loss has an interest in the shipment. The court charged that the loss must have been charged back to the consignor. We can see, in the record, testimony sufficient to show that there was damage or loss in respect to each shipment.

We have assumed as correct, in our discussion of the case, the position of defendant, that the reconsignment at Berkley or elsewhere would not make a new shipment or change the initial point in the line of transportation, and thus break its continuity, so as to bring the defendant's liability within the operation of the Carmack amendment as to the first carrier. *Atchison, T. & S. R. R. v. Harold,* 241 U. S., 371 (60 Law Ed., 1050); *Missouri, etc., R. R. v. Wall,* 24 U. S., 383-388; *Myers v. R. R.,* 171 N. C., 194. When the consignor controls the bill of lading or has the right to change the destination or divert the goods to a new one, this does not break the connection, but the new destination is regarded as if it were the original one. *Myers v. R. R.,* 171 N. C., 190.

The letters on the bills, S. L. & C., meaning shippers load and count, merely changed the burden of proof. If they had not been there, and the carrier had loaded and counted the goods, the burden would have been upon it, if there had been any loss or damage, but where the shipper undertakes to load and count the goods, this burden is shifted and the latter must affirmatively show his damage. This burden was properly placed on him by the judge, and there being some evidence of the loss and damage, there was no error on this score.

The judge could not have nonsuited the case upon the ground that there was no evidence. In the case of S. L. & C. shipments, these letters required explanation, and, besides, there was some evidence upon all phases of the case, so far as defendant's negligence is concerned, when we consider and apply the rule stated in *Meredith v. R. R., supra,* and the other authorities cited in connection therewith. There was also evidence as to the damages and plaintiff's right to recover them, and in respect to those instances where the defendant company has been acquitted of negligence, it is liable, whether or no the loss or damage occurred on its line, under the Carmack amendment.

The jury found that, while the defendant was not the initial carrier, it was guilty of individual negligence, or that the loss or damage by

negligence took place on its line, and that in the other instances it was liable under the Carmack amendment, and assessed the damage, for which the judgment was entered. There was no error in the rulings which vitiated the verdict.

Before closing we will say, in answer to the position taken by defendant in its supplemental brief, that the cases of *Ch. & W. C. R. R. v. Varnville F. Co.,* 237 U. S., 567 (59 L. Ed., 1137), and *Atchison, etc., R. R. v. Harold,* 241 U. S., 371 (60 L. Ed., 1050), have not been overlooked. We have not held, in this case, that an intermediate or delivering carrier is liable for a loss or damage not shown to have happened while the goods were in its possession. We have, on the other hand, held defendant liable as the initial carrier, or when it was not such but an intermediate one, we have so held it liable, because there was some evidence, under the principle of Meredith's case, that the loss did actually occur on its line. Nor have we failed to give the defendant the benefit of the position that a reconsignment, at an intermediate point, under an exchange bill of lading, did not constitute two separate and distinct shipments. *Atchison, etc., R. R. v. Harold, supra.* Nor do we think that this case, owing to its peculiar facts, falls within the principle of *Galveston, etc., R. R. v. Wallace,* 223 U. S., 481 (56 L. Ed., 516). There is testimony here which, in at least one view of it, tends to show that the North River Line took no part in a continuous shipment from Jarvisburg to the final destination in the West, but merely delivered the potatoes at Elizabeth City, where all the lots of potatoes were assembled, and there weighed and reassorted, and then started on their interstate journey to Chicago, Ill., or elsewhere in some other State. The bill of lading was not, in this case, of such a decisive character as to preclude inquiry as to whether it was really that of defendant as the initial carrier, and the matter was properly left to the jury.

We have not found it necessary to consider the case of *Paper Box Co. v. R. R.,* 177 N. C., 351, but have decided the case on other grounds.

The question as to the number of the cars was one of identity, and was for the jury to decide upon the evidence.

We have endeavored to review all of defendant's material points, and after doing so no error is found.

No error.